# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **PAUL STERLING on behalf of himself individually, and ALL OTHERS SIMILARLY SITUATED** | § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO. 4:20-cv-00910** |
| **v.** | § § | |
| **GREATER HOUSTON TRANSPORTATION COMPANY, TEXAS PARATRANSIT, INC., YELLOW CAB PARATRANSIT SERVICES, INC. and METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY,** | § § § § § § § § | |
| **Defendant.** | § | |

---

**PLAINTIFF'S MOTION TO APPROVE STIPULATION FOR CERTIFICATION (DKT. NO. 77) AND SUPPLEMENTAL MOTION FOR CERTIFICATION UNDER THE FAIR LABOR STANDARDS ACT**

---

Filed by:

Don J. Foty
State Bar No. 24050022
S.D. Tex. No. 711552
HODGES & FOTY, LLP
4409 Montrose Blvd., Suite 200
Houston, Texas 77006
Telephone: 713-523-0001
Facsimile:  713-523-1116
dfoty@hftrialfirm.com

# TABLE OF CONTENTS

I.     SUMMARY OF ARGUMENT ..........................................................................1

II.    BACKGROUND ...........................................................................................2

III.   ARGUMENTS AND AUTHORITIES ........................................................10

   A.   Based on the holding in *Swales*, the Court should approve the Stipulation for Certification and authorize notice to the Class Members. ................................................................11

   B.   Nearly every court in the Fifth Circuit faced with the issue of whether to certify a collective action following *Swales* has granted certification............................................................13

   C.   It appears that Metro is not disputing that the Plaintiff and Class Members are "similarly situated."  Instead, Metro wrongly believes that certification should be denied because the Court must first find Metro liable as an employer.  Metro's argument improperly "places the cart before the horse.". ..............................................................................................16

   D.   Assuming, *arguendo*, that the Court should make a liability finding at this stage, the overwhelming evidence is that Metro is an employer under the FLSA ..........................18

   E.   Certification furthers the *Hoffman La-Roche* goal of judicial economy ..........................25

V.    CONCLUSION ..........................................................................................25

Page(s)

Cases

*Badon v. Berry's Reliable Resource, LLC*,
  2021 WL 933033 (E.D. La. Mar. 11, 2021) ....................................................................14, 15

*Dole v. Snell*,
  875 F.2d 802 (10th Cir. 1989) ............................................................................................. 24

*Eisen v. Carlisle & Jacqueline*,
  417 U.S. 156 (1974) ............................................................................................................. 16

*Gaye v. TJD Transportation*,
  2019 WL 2603290 (S.D. Tex. June 25, 2019) ...................................................................... 18

*Halferty v. Pulse Drug Co., Inc.*,
  821 F.2d 261 (5th Cir. 1987) ............................................................................................... 23

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*,
  161 F.3d 299 (5th Cir. 1998) ............................................................................................... 21

*Hernandez v. Pritchard Indus. (Southwest), LLC*,
  2021 WL 1146005 (W.D. Tex. Mar. 25, 2021) ................................................................14, 15

*Karna v. BP Corp. N. Am., Inc.*,
  2013 WL 1155485 (S.D. Tex. Mar. 19, 2013) ...................................................................... 22

*Lusardi v. Xerox Corp.*,
  118 F.R.D. 351 (D.N.J. 1987) ............................................................................................. 10

*McLaughlin v. Seafood, Inc.*,
  687 F.2d (5th Cir. 1989) ...................................................................................................... 23

*Miller v. Mackey Intern., Inc.*,
  452 F.2d 424 (5th 1971) ....................................................................................................... 17

*Mooney v. Aramco Servs. Co.*,
  54 F.3d 1207 (5th Cir. 1995) ............................................................................................... 10

*Pereira v. Foot Locker, Inc.*,
  261 F.R.D. 60 (E.D. Pa. 2009) ............................................................................................ 17

*Powell v. Collier Constr.*,
  2005 WL 2429245 (W.D. La. 2005) ..................................................................................... 22

iii

*Reich v. Priba Corp.*,
    890 F. Supp. 586 (N.D. Tex. 1995) ................................................................ 24

*Sandoz v. Cingular Wireless, LLC*,
    553 F.3d 913 (5th Cir. 2008) ...............................................................2, 3, 5, 6

*Sperling v. Hoffman-La Roche*,
    110 S. Ct. 482 (1989) ........................................................................................ 25

*Swales v. KLLM Transport Servs., LLC*,
    985 F.3d 430 (5th Cir. 2021) ................................................................... Passim

*United States Parole Commission v. Geraghty*,
    445 U.S. 396 (1980) .......................................................................................... 16

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ............................................................................ 16

*Vaughn v. Document Grp. Inc.*,
    250 F. Supp. 3d 236 (S.D. Tex. 2017) ............................................................. 17

*Young v. Energy Drilling Co.*,
    2021 WL 1550343 (S.D. Tex. Apr. 20, 2021) .............................................13, 14

Statutes

29 U.S.C. § 216 ............................................................................................................ 10

Rules

Fed. R. Civ. P. 23 ......................................................................................................... 10

## I.  SUMMARY OF ARGUMENT

Class certification under the Fair Labor Standards Act is appropriate in this case for several reasons.  First, Plaintiff and Yellow Cab have reached an agreement for class certification.  During the pre-certification discovery phase, each witness that was deposed testified that there are no material differences amongst the drivers in the METROLift program.  As a result, Plaintiff and Yellow Cab submitted a Stipulation for Certification, filed as Docket No. 77. (*See* Dkt. No. 77).[1] The Stipulation identifies a narrowly defined Class of workers for which there is no reasonable dispute that certification is appropriate. The agreed Class is defined as follows:

> **All current and former drivers of the METROLift program who were classified as independent contractors for at least one week during the three year period prior to the date the Court authorizes notice to the present. Excluded from this class are any drivers in the METROLift program who either (1) owned a taxi cab for use in the METROLift program during the entire three year period prior to the date the Court authorizes notice, or (2) who were under a lease to own program during the entire three year period prior to the date the Court authorizes notice.**

(*Id*.)

Plaintiff asks that the Court to approve the Stipulation for Certification and authorize notice to the Class Members, as defined above.

Second, based upon the Fifth Circuit's decision in *Swales*, certification is appropriate because liability in this case can be resolved on a class basis. *See Swales v. KLLM Transport Servs., LLC*, 985 F.3d 430 (5th Cir. 2021). The witnesses who were deposed testified that the drivers in the METROLift program performed the same duties, were subject to the same hiring requirements, completed the same training, wore the same uniforms, and were required to follow the same policies and procedures.

---

[1] Plaintiff's Counsel contacted Counsel for Metro inquiring if Metro will join in the Stipulation for Certification.  Counsel for Metro never responded to Plaintiff's Counsel.

Third, there are approximately 70 drivers from the METROLift program already in this case. Based on the facts and evidence presented, certification will result in an efficient resolution of this case.  Approving the Stipulation for Certification (and granting class certification) will result in the claims of the Class Members being resolved in one proceeding, rather than burdening the Court with multiple repeated lawsuits addressing the same facts and legal issues.

Finally, as each day passes, the statute of limitations continues to run on each of the Class Members' claims.  *See, e.g., Sandoz v. Cingular Wireless, LLC*, 553 F.3d 913, 916-17 (5th Cir. 2008).  Therefore, notice to the Class Members is necessary to ensure that the claims of the Class Members are properly preserved.  Accordingly, the Court should approve the Stipulation for Certification and authorize notice to the Class Members.

## II.     BACKGROUND

Following the completion of the pre-certification discovery stage, Yellow Cab and the Plaintiff reached an agreement for class certification under the FLSA.  That agreement was filed with the Court as Docket Entry 77.  (*See* Dkt. No. 77).  The Stipulation for Certification was reached only after the Parties heard the testimony of five witnesses who were deposed during the pre-certification stage.  Each of the witnesses who were deposed testified that all drivers were subject to the same work conditions and there are no material differences between the drivers in the METROLift program.

The key testimony from each witness who was deposed is listed below:

**1.  Julia Saldana – Former General Manager of Yellow Cab Paratransit**

Ms. Saldana was chosen as a witness by Metro.  Ms. Saldana agreed that there are no differences amongst the drivers in the METROLift program.  Specifically, the hiring, training, pay, supervision, policies/procedures, uniforms, and job duties for the drivers are the same.  She testified as follows:

18  Q.   Are all drivers in the METROLift program
19  subject to the same enrollment requirements?
20     A.  Yes.
21     Q.   They're all -- are they all subject to the same
22  training requirements?
23     A.  Yes.

(Ex. "1" – Deposition of Julia Saldana, at pg. 63, lns. 18-23).

12  Q.   Now, you would agree with me that all drivers
13  in the METROLift program are paid by the hour; correct?
14     A.   Yes, they're -- they're paid by whatever hour,
15  you know, in the contract.
16  Q.  Okay.  And they all perform the same duties;
17  correct?
18     A.   Correct.
19     Q.   Okay.  And they follow the same Metro policies
20  and procedures; correct?
22     A.   Right, they follow the contract policies and
23  procedures, yes.
24     Q.   (BY MR. FOTY)  Okay.  And they have to
25  comply -- all drivers in the METROLift program have to
1  comply with the METROLift contract; correct?
2     A.   Correct.
4     Q.   (BY MR. FOTY)  All right.  And they wear the
5  same uniform; correct?
6     A.   Yes.
7     Q.   Okay.  And they drive routes for METROLift;
8  correct?
9     A.   Correct.
10     Q.   All right.  And every driver in the METROLift
11  program is registered in Trapeze; correct?
12     A.   Yes.
**13     Q.   All right.  In terms of what the drivers do,**
**14  how they're paid, the uniforms they wear, and the**
**15  policies they got to follow, you would agree that the**
**16  drivers are the same; correct?**
**18     A.   Correct**

(*Id*. at pg. 106, ln. 12 to 107, ln. 18) (emphasis added).

### 2.  <u>Ingrid Maxwell – Current Driver in the METROLift Program</u>

Ms. Maxwell is a current driver in the METROLift program.  She was chosen as a witness

by Metro.  Ms. Maxwell confirmed that there are no differences amongst any of the drivers and

3

her work experience, including her pay, training, job duties, uniform, and the policies and

procedures she was required to follow are the same as those for all other METROLift drivers.  She

testified as follows:

> 15  Q.  Okay.  You follow the same policies and
> 16  procedures as all the other METROLift drivers; is that
> 17  correct?
> 18     A.  Yes, that's correct.
> 19     Q.  You're paid an hourly rate like all the other
> 20  METROLift drivers; is that right?
> 21     A.  That's correct.
> 22     Q.  Okay.  And you went through the -- you went
> 23  through the same training as all the other METROLift
> 24  drivers; is that right?
> 25     A.  That's correct.
>
> **1     Q.  Okay.  And everything we talked about where**
> **2  once the start of your shift begins and you're**
> **3  communicating with the dispatchers at Metro and the**
> **4  supervisors at Metro, that's the same for all METROLift**
> **5  drivers; is that right?**
> **6     A.  That's -- that's correct.**
> **7     Q.  Okay.  Your work experience in the METROLift is**
> **8  the same work experience as all other drivers in the**
> **9  METROLift program?**
> **11     A.  Yes.**

(Ex. "2" – Deposition of Ingrid Maxwell at pg 68, ln. 15 to 69, ln. 11) (emphasis added).

> 18         All right.  Let me ask you this:  To your
> 19  knowledge, all METROLift drivers, do they do the same
> 20  work?
> 21     A.  Yes, we do.
> 22     Q.  Okay.  And I think you said this earlier, but
> 23  they all wear the same uniforms; right?
> 24     A.  Yes.
> 25     Q.  And all METROLift drivers got to follow the
> 1  same policies and procedures?
> 2  A.  Yes, we do.
> 4     Q.  (BY MR. FOTY)  And all METROLift drivers are
> 5  paid -- I think y'all are paid by the hour; is that
> 6  right?
> 7     A.  Yes, we are.
> **8     Q.  Okay.  So knowing what you do and what the**
> **9  other drivers do, you agree there's no difference**

> **10  between you and any of the other drivers; is that right?**
> **11     A.  That's correct.**

(*Id*. at pg. 63, ln. 18 to 64, ln. 11) (emphasis added).

### 3.  <u>David Michael Spears – Corporate Representative for Yellow Cab Defendants</u>

David Michael Spears was selected as the 30(b)(6) representative for the Yellow Cab Defendants.  He testified that there are approximately 230 drivers in the METROlift program. (Ex. "3" – Deposition of David Michael Spears at pg. 92, lns. 16-20).  Of those drivers, approximately 20 are "lease-to-own" operators and one person actually owns the vehicle. (*Id*. at 92, ln. 21 – 93, ln. 14).  Those approximately 21 individuals have been excluded from the Class in the Stipulation for Certification. (*See* Dkt. No. 77).  Mr. Spears confirmed that there are no other differences between the drivers, stating as follows:

> 21  Now, in
> 22  terms of the difference between the drivers, METROLift
> 23  drivers, it's my understanding that there is one METROLift
> 24  driver who actually owns the vehicle.
> 25          Correct?
> 1     A.  Yeah.
> 2          So drivers have the ability to bring their
> 3  own vehicles online.  There is just one currently that we
> 4  have that purchased his vehicle outside, had a wheelchair
> 5  ramp installed, went through all that, financed it
> 6  himself.
> 7     Q.  Okay.
> 8     A.  But we also have driver/owners that they're
> 9  doing a lease purchase agreement with Yellow Cab.  So
> 10  they're the beneficial owner now, but once it's paid off,
> 11  they own the vehicle.
> 12     Q.  Okay.
> 13          How many of those drivers are there?
> 14     A.  Uh, probably around 20.

(Ex. "3" at pg. 92, ln. 21 to 93, ln. 14).

> **6          Other than what we have talked about, are**
> **7  you aware of any distinctions between the drivers in terms**
> **8  of the way they are paid, their duties, with the level of**

> 9   **control that's exercised against them while they are**
> 10  **driving in the METROLift program?**
> 11     **A.  <u>None that I am aware of</u>.**
> 12     **Q.  Okay.**
> 13        **Are you -- Other than what we have talked**
> 14  **about, are you aware of any distinction at all between the**
> 15  **drivers in the METROLift program?**
> 16     **A.  <u>No.</u>**

(*Id*. at pg. 96, lns. 6-16) (emphasis added).

Mr. Spears confirmed that the drivers in the Class (as defined earlier) are the same and there are no differences between them in terms of hiring, training, pay, supervision, policies/procedures, and job duties.

> 13   Are all drivers in the METROLift program
> 14   subject to the same eligibility requirements?
> 15      A.  Yes.

(*Id*. at pg. 17, lns. 13-15).

> 21   Q.  Do the drivers in the METROLift program complete
> 22   the same training?
> 23      A.  Yes.

(*Id*. at pg. 21, lns. 21-23).

> 14   Q.  Are all METROLift drivers registered in METRO's
> 15   Trapeze system?
> 16      A.  Yes.

(*Id*. at pg. 92, lns. 14-16).

> 4    While they're driving in the METROLift
> 5    program, all drivers are paid by the hour.
> 6       Correct?
> 7    A.  Uh, yes.
> 8    Q.  Okay.
> 9       While they're driving in the METROLift
> 10   program, all drivers -- and I'll just call them "METROLift
> 11   drivers" for simplicity.
> 12      METROLift drivers all perform paratransit
> 13   transportation duties.
> 14      Correct?

```
15    A.  Correct.
16    Q.  Okay.
17          All METROLift drivers have to follow
18  METRO's policies and procedures?
19    A.  The contract requirements, yes.
20    Q.  Okay.
21          So all METROLift drivers have to comply
22  with the METROLift contract?
23    A.  Yes.
```

(*Id*. at pg. 91, lns. 4-23).

### 4.  **Lovie Boone – Current "lease-to-own" Driver**

Lovie Boone is a "lease-to-own" driver who was deposed.  Although she is not eligible to participate in this case based upon the Parties' agreed Class definition, she testified that all drivers in the METROLift program are the same.  She explained that the work conditions, pay, policies/procedures, uniforms, and job duties for the drivers in the METROLift program are the same.

```
16  Q.  Only drivers approved in the METROLift program
17  can drive in the METROLift program; right?
18    A.  That's correct.
1    Q.  All right.  Let me ask you this:  To your
2  knowledge, all drivers in the METROLift program do the
3  same work; right?
5    A.  That is correct.
6    Q.  (BY MR. FOTY)  They all wear the same uniform;
7  correct?
8    A.  That is correct.
9    Q.  They're all paid an hourly rate; correct?
10    A.  Correct.
11    Q.  They all follow the same policies and
12  procedures; correct?
14    A.  Yes, to my knowledge.
15    Q.  (BY MR. FOTY)  Yeah.  They all drive Metro
16  customers; right?
17    A.  Correct.
18    Q.  Okay.  In terms of the work, the pay, the way
19  you're paid hourly, uniforms you wear, and the policies
20  and procedures, there's no difference between the
21  drivers; correct?
```

7

23    **A. Correct.**

(Ex. "4" – Deposition of Lovie Boone at pg. 82, lns. 16 to 83, ln. 23) (emphasis added).

**5. Jeremy Schoech – Corporate Representative for Defendant Metro**

       Jeremy Schoech was selected as the 30(b)(6) representative for Defendant Metro.  He was

asked if he knew of any differences between the drivers in the METROLift program and he was

not able to identify any.  To the contrary, he testified that all drivers in the METROLift program

have the same hiring requirements, are required to comply with the same METROLift contract,

and have the same duties and responsibilities.

> 9  And all drivers are expected to comply with
> 10  that contract in the scope of service.
> 11     Correct?
> 13     THE WITNESS:  All METROLift drivers working
> 14  under that contract are expected to meet the terms of that
> 15  contract.
> 16    Q.   (BY MR. FOTY) Okay.
> 17     So there is one contract applicable to all
> 18  drivers.
> 19     Correct?
> **21     THE WITNESS:  There is one METROLift**
> **22  contract with Yellow Cab applicable to the METROLift**
> **23  Yellow Cab drivers.**

(Ex. "5" – Deposition of Jeremy Schoech at pg. 47, lns. 9-23) (emphasis added).

> 5  Are there any drivers that do not have to
> 6  comply because they are not required to follow the
> 7  METROLift contract?
> 9     THE WITNESS:  Can you clarify what drivers
> 10  you're talking about?
> 11    Q.   (BY MR. FOTY) Yeah.
> 12     METROLift drivers.
> 13    A.   I can't think of any drivers that wouldn't --
> 14  would be granted any exception to operate the METROLift
> 15  service.

(*Id*. at pg. 97, lns. 5-15).

> 13    And no person can drive in the METROLift

14   program unless METRO reviews their file and determines
15   that all eligibility requirements have been met.
16            Correct?
17      A.   That is correct.

(*Id*. at pg. 31, lns. 13-17).

**19      Are there any differences amongst the**
**20   METROLift drivers that you're aware of?**
**22            THE WITNESS:  I wouldn't know.**
**23      Q.   (BY MR. FOTY) You are not aware of any?**
**25            THE WITNESS:  I don't know.**

(*Id*. at pg. 98, lns 19-25) (emphasis added).

Mr. Schoech further explained that the decision to classify the drivers in the METROLift

program was done for the entire group of drivers and was not made on a driver by driver basis. (*Id*.

at pg. 24, lns. 7-10).

7   Has METRO ever made a driver-by-driver decision
8   regarding whether to treat the drivers in the METROLift
9   program as independent contractors or employees?
10      A.   No.

(*Id*.)

Further, Mr. Schoech confirmed that Metro did not perform any research or investigation

into whether the drivers should be classified as independent contractors or employees under the

FLSA. (*Id*. at pg. 22, lns. 12-20).

12    What research was done by METRO to
13   determine whether the METROLift drivers should be
14   classified as employees or independent contractors?
16            THE WITNESS:  There was no (indecipherable
17   utterance).
18            THE REPORTER:  Excuse me.  Come again with
19   that answer, please.
20            THE WITNESS:  I said there was no research.

(*Id*.) (emphasis added)

6.  **Summary of Deposition Testimony**

Therefore, the testimony from the five witnesses who were deposed during the pre-certification stage establish that there are no differences between the Plaintiff and Class Members. The Class Members (1) perform the same job duties, (2) are paid the same, (3) wear the same uniforms, (4) follow the same policies and procedures, (5) are subject to the same hiring requirements, (6) complete the same training, (7) are supervised the same, (8) are subject to the same level of control, and (9) are required to follow the same METROLift Contract.  Under these facts, the Court should find the drivers in the Class "similarly situated" under the FLSA and authorize notice to these Class Members as stated in the Stipulation for Certification.

### III.     ARGUMENTS AND AUTHORITIES

Under 29 U.S.C. § 216, an employee may bring an action against an employer "[on] behalf of himself ... and other employees similarly situated." Unlike a Rule 23 class action, in which plaintiffs "opt out" of the class, a § 216 plaintiff must "opt in" to become part of the class. *See* Fed. R. Civ. P. 23; *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). Until recently, the method adopted by this Court for determining whether to certify a collective action under § 216(b) was the *Lusardi* two-tiered approach. Under *Lusardi*, the plaintiff would notify potential members of the action and then the court would engage in a factual determination as to whether the putative class members are similarly situated. *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987); *Mooney*, 54 F.3d at 1213–14.

However, earlier this year, the Fifth Circuit handed down a new opinion. In *Swales v. KLLM Transport Servs., LLC*, 985 F.3d 430 (5th Cir. 2021), the Fifth Circuit abrogated the *Lusardi* approach. "Instead of adherence to *Lusardi*, or any test for 'conditional certification,' a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.' And then it should authorize

preliminary discovery accordingly." *Id.* at 441. The purpose of this analysis is to determine "early in the case, **whether merits questions can be answered collectively**." *Id.* at 442 (emphasis added). In other words, the Fifth Circuit explained that when the facts and legal arguments relevant to proving the Plaintiff's claims are the same facts and legal arguments relevant to proving the Class Members' claims, certification should be granted.

In this case, the Court previously authorized preliminary discovery. That discovery has been completed and Plaintiffs and Yellow Cab have agreed that this case should be certified as a collective action. The Court should now approve the Parties' stipulation and authorize notice to the Class Members.

### A. Based on the holding in *Swales*, the Court should approve the Stipulation for Certification and authorize notice to the Class Members.

In *Swales*, the Fifth Circuit explained that where "the plaintiffs all have the same job description and the allegations revolve around the same aspect of that job," certification should likely be granted. *Id.* at 441-42. The Fifth Circuit stated as follows:

> For example, [] notice might be justified when the pleadings and only preliminary discovery show sufficient similarity between the plaintiffs' employment situations. In those types of cases, **the plaintiffs all have the same job description**, **and the allegations revolve around the same aspect of that job**.

*Id.* (emphasis added).

The facts in the present case are ideal for certification under *Swales*. Here, the Class Members performed the same job duties and the allegations that they are owed overtime wages revolve around the same work that they all performed. Moreover, none of the witnesses who were deposed testified that the Class Members are different in any material way, as noted earlier. Indeed, the following facts are undisputed: the Plaintiffs and Class Members:

11

ι   Perform the same job duties;[2]

ι   Work only in Harris, County;[3]

ι   Transport only those individuals approved in advance by Metro;[4]

ι   Are paid on an hourly basis and are prohibited from charging a fare or fee to customers;[5]

ι   Wear the same uniforms;[6]

ι   Follow the same policies and procedures;[7]

ι   Are subject to the same hiring requirements;[8]

ι   Complete the same training;[9]

ι   Are supervised the same;[10]

ι   Are subject to the same level of control;[11]

ι   Are required to follow the same METROLift Contract; and[12]

ι   Are given the vehicles to drive.[13]

The Fifth Circuit in *Swales* stated that certification should be granted when "merits questions can be answered collectively." *Swales*, 985 F.3d at 442.  Here, the material facts with

---

[2] (Ex. "1" at pg. 106, lns. 16-18); (Ex. "2" at pg. 63, ln. 18 to 64, ln. 11); (Exs. "6" to "9").

[3] (Dkt. No. 35-1).

[4] (Ex. "3" at pg. 61, lns. 8-24); (Ex. "4" at pg. 78, lns. 21-23); (Ex. "5" at pg. 18, ln. 16 – 19, ln. 2).

[5] (Ex. "3" at pg. 91, lns. 4-8); (Ex. "4" at pg. 78, ln. 24 to 79, ln. 1); (Dkt. No. 35-17 at pg. Metro-Sterling 177).

[6] (Ex. "1" at pg. 106, lns. 4-6); (Ex. "2" at pg. 63, lns. 22-24).

[7] (Ex. "1" at pg. 106, lns. 19-23); (Ex. "2" at pg. 63, ln. 25 to 64, ln. 2); (Ex. "3" at pg. 91, lns. 17-19); (Ex. "4" at pg. 82, lns. 11-14); (Ex. "5" at pg. 47, lns. 9-23).

[8] (Ex. "5" at pg. 31, lns. 13-17).

[9] (Ex. "1" at pg. 63, lns. 21-23); (Ex. "2" at pg. 68, lns. 22-25).

[10] (Ex. "1" at pg. 98, ln. 16 to 99, ln. 10); (Ex. "2" at pg. 62, lns. 3-25; pg. 69, lns. 1-11); (Ex. "3" at pgs. 60, ln. 14 to 61, ln. 6).

[11] (Ex. "1" at pgs. 75, ln. 4 to pg. 77, ln. 24, pg. 79, lns. 1-13); (Ex. "3" at pgs 39, ln. 8 to 40, ln. 15; pg. 41, lns. 13-19; pg. 42, lns. 3-6; pgs. 60, ln. 14 to 61, ln. 6); (Dkt. No. 35-17 at pgs. Metro-Sterling 136-139, 176-177).

[12] (Ex. "5" at pg. 97, lns. 5-15); (Dkt. No. 35-17)

[13] (Ex. "1" at pgs. 100, ln. 24 to 102, ln. 2).

respect to the Plaintiff are the same material facts for the Class Members.  Similarly, the legal issues relevant to the Plaintiff's claim that he was an employee are the same legal issues relevant to the claims of the Class Members.  Thus, the liability question as to whether the drivers are employees or independent contractors can be resolved on a class basis.

Indeed, the Court can evaluate liability on a class basis by addressing these common questions: (1) did the Plaintiff and Class Members perform low skilled work indicative of employee status, (2) did Metro exert control over the Plaintiff and Class Members (through the policies and procedures in the METROLift contract and the supervision by Metro employees) sufficient to be deemed employers, (3) were the Plaintiff and Class Members paid in a manner indicative of employee status (they were paid by the hour), (4) were the Plaintiff and Class Members required to complete mandatory training to perform their job duties, and (5) were the Plaintiff and Class Members subject to being disciplined or fired for not following Metro's policies and procedures.  These common questions can be resolved on a class basis because the facts and evidence are the same for the Plaintiff and Class Members.

Therefore, the *Swales* decision gave broad authority to the Court to certify a collective action and described the facts of this case as the type of case that is appropriate for certification. Yellow Cab and Plaintiff have agreed to certification.  The Court should now exercise its broad authority and approve the stipulation allowing notice to the Class Members.

**B. Nearly every court in the Fifth Circuit faced with the issue of whether to certify a collective action following *Swales* has granted certification.**

Plaintiff's Counsel has found five decisions where courts in the Fifth Circuit addressed the issue of certification under the FLSA following *Swales*.  In four of the decisions, certification was granted. *See Young v. Energy Drilling Co*., No. Civ. A. 4:20-cv-1716, 2021 WL 1550343 (S.D. Tex. Apr. 20, 2021); *T.S. v. The Burke Foundation*, No Civ. A. 1:19-cv-809, 2021 WL 1807994

(W.D. Tex. Feb. 22, 2021); *Hernandez v. Pritchard Indus. (Southwest), LLC*, No. Civ. A. 20-cv-0508, 2021 WL 1146005 (W.D. Tex. Mar. 25, 2021); *Badon v. Berry's Reliable Resource, LLC*, No. Civ. A. 19-cv-12317, 2021 WL 933033 (E.D. La. Mar. 11, 2021).  Thus far, when certification under the FLSA has been in dispute after the *Swales* decision was issued, <u>Fifth Circuit courts have granted certification 80% of the time</u>.

Specifically, Judge Lake approved certification in *Young v. Energy Drilling Co.*, No. Civ. A. 4:20-cv-1716, 2021 WL 1550343 (S.D. Tex. Apr. 20, 2021).  In *Young*, the court certified a broad class that included "rig managers, drillers, derrickmen, motormen, floormen, and toolpushers." *Id*. at *3.  The court determined that the class members, despite having different job titles and job duties, were paid the same types of bonuses. *Id*.  The court also determined that the class members were subject to the same pay practice of those bonuses being classified as discretionary. *Id*.  The court found these facts alone sufficient for certification and stated:

> No further discovery is needed to conclude that Young is similarly situated to other employees who were subjected to the same pay practice. The evidence which Young has provided supports approval of a notice for the positions and bonuses discussed above.

*Id*.

Likewise, in *T.S. v. The Burke Foundation*, No Civ. A. 1:19-cv-809, 2021 WL 1807994 (W.D. Tex. Feb. 22, 2021), the court granted certification under the FLSA to a class of minors who were alleged to have worked for a treatment home (where they resided) but were not paid any wages.  The court defined the "central question" as whether the plaintiffs were subject to the FLSA and entitled to the compensation for the time they spent on work projects while being residents of the defendant. *Id*. at *4.  In other words, the central question was whether the plaintiffs were subject to the protections of the FLSA. *See id*.  The *T.S.* Court granted certification because this question could be resolved on a class basis. *See id*.

14

> Plaintiffs have made a sufficient factual showing that the potential class members' claims all center on the same factual nexus and injury—non-payment of wages for completion of Work Projects at the direction of Pathfinder-RTC.
>
> …
>
> The Court thus finds that Plaintiffs have met their burden of showing that a similarly situated group of potential plaintiffs exists, and that no threshold issues prevent the issuance of notice. Therefore, notice is warranted.

*Id*. at *4-*5.

In *Hernandez v. Pritchard Indus. (Southwest), LLC*, No. Civ. A. 20-cv-0508, 2021 WL 1146005 (W.D. Tex. Mar. 25, 2021), the court granted certification for a broad group of janitorial workers who were not paid overtime wages when they worked more than 40 hours in a week. *Id*. at *1-*2. The court certified a class that consisted of workers with the job titles: "Working Building Supervisor, "General Service Worker," "General Cleaner," and "Janitor." *Id*. at *2.

Finally, in *Badon v. Berry's Reliable Resource, LLC*, No. Civ. A. 19-cv-12317, 2021 WL 933033 (E.D. La. Mar. 11, 2021), the court denied a motion to decertify a class of workers who were alleged to have been misclassified as independent contractors. In *Badon*, the court stated that the "primary dispute in this matter is whether Plaintiffs and Opt-Ins were independent contractors or employees." *Id*. at *3. The *Badon* Court denied the motion to decertify following *Swales* because the court determined that it was able to resolve the liability question of whether the plaintiffs were employees or independent contractors on a class basis. *See id*.

> That said, what evidence is before the Court suggests that the members of the conditional class are similarly situated so that this matter could appropriately be tried on a collective basis. Plaintiffs have provided the affidavits of Stacey Badon and Anthony Badon, **which indicate that the factual and employment settings for home healthcare workers vis-à-vis Defendants were similar.**

*Id*.

In this case, the facts are stronger than those in *Young*, *T.S*., *Hernandez*, and *Badon*. In the present case, there is no dispute that the Plaintiff and Class Members were subject to the same

work conditions.  The pre-certification discovery demonstrated that there are no material distinctions between the Plaintiff and Class Members in terms of job duties, pay, the level of control and supervision exercised over them, uniforms, training, and job classification.  In fact, Yellow Cab has agreed to certification in this case after noting the similarities between the Plaintiff and Class Members.  Even Metro's Corporate Representative was not able to identify any distinction between the Plaintiff and Class Members. (Ex. "5" at pg. pg. 98, lns 19-25). Under these facts, the Court should authorize notice to the Class Members just like in *Young*, *T.S.*, *Hernandez*, and *Badon*.

**C.   It appears that Metro is not disputing that the Plaintiff and Class Members are "similarly situated."  Instead, Metro wrongly believes that certification should be denied because the Court must first find Metro liable as an employer.  Metro's argument improperly "places the cart before the horse."**

It appears that Metro's sole argument is that the Court should deny certification because the Court has not yet granted summary judgment finding the drivers to be employees.  Metro's argument is irrelevant because the issue at this stage is not whether the Plaintiff will ultimately prevail, but whether the Court can decide whether the Plaintiff and Class Members are employees or independent contractors on a class basis.

Metro's argument improperly places the "cart before the horse." *See Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits...."). The Supreme Court has noted that a named plaintiff in a potential class action has a "procedural ... right to represent a class" that is independent of his substantive claims. *United States Parole Commission v. Geraghty*, 445 U.S. 396, 402 (1980)); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1232 (9th Cir. 1996) (noting that the merits of the case are irrelevant to class certification).

16

The Fifth Circuit addressed this precise issue in *Miller v. Mackey Intern., Inc.*, 452 F.2d 424, 427 (5th 1971) and stated as follows:

> This portion of the order indicates to us that in passing on the propriety of the class action the district judge may have considered whether the petition stated a cause of action or whether Miller would succeed on the merits. This was improper. In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.
>
> **The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action.**

*Id*. (emphasis added).

At the certification stage, the Court should not decide who will ultimately prevail. *See id; see also Vaughn v. Document Grp. Inc.*, 250 F. Supp. 3d 236, 239 (S.D. Tex. 2017).  Whether Metro actually violated the FLSA is a question that will be answered at a later date, after the Parties have had the benefit of unimpeded discovery. *See Pereira v. Foot Locker, Inc.,* 261 F.R.D. 60, 63–64 (E.D. Pa. 2009).

Indeed, the *Swales* Court made clear that the Court should not making a liability finding at the certification stage, stating that there should be "[n]o judicial thumbs (or anvils) on the scale" related to the merits of the case at the certification stage.  *Swales*, 985 F.3d at 436 (emphasis added). Instead, the issue for certification is simply "whether merits questions can be answered collectively" and this certification decision must be made "as early as possible." *Id.* at 441-442. Despite have months of discovery and multiple rounds of briefing on certification, there is simply no evidence that the Plaintiff and Class Members are *dissimilar* in any significant way.  As such, the Court should now grant the Stipulation for Certification and authorize notice to the Class Members.

17

**D. Assuming, *arguendo*, that the Court should make a liability finding at this stage, the overwhelming evidence is that Metro is an employer under the FLSA.**

In *Gaye v. TJD Transportation*, No. Civ. A. H-18-243, 2019 WL 2603290 (S.D. Tex. June 25, 2019) (Rosenthal, C.J.), this Court granted summary judgment finding a driver to be an employee under the FLSA under very similar facts as those in this case. In *Gaye*, the plaintiff worked as a limousine driver who was classified as an independent contractor. *Id.* As a limousine driver, the plaintiff was given the vehicles to drive, told when and where to transport passengers, and the fares to charge. *Id.* at *3. This Court stated: "[t]he undisputed record evidence establishes that, as a matter of law, Gaye was an employee." *Id.* at *2. This Court further explained:

> **Gaye's work resembles that of the employee-drivers**. Gaye received a flat daily rate, and the defendants told him when to start working; who, when, and where to pick up; and required him to accept all driving assignments. (*see* Docket Entry No. 50-1 at 11, 18, 61, 50). In addition to assigning drivers, Gacou hired and fired employees for the defendants, showing that he "controlled the 'meaningful' economic aspects of the business." *Hopkins*, 545 F.3d at 343. While Gaye could choose what refreshments to put in the car and what route to take, these are "minor...tasks [that] cannot be bootstrapped into an appearance of real independence." *Brock*, 814 F.2d at 1049.
> …
> The defendants set the shifts, paid Gaye a flat rate, and told him what fares to charge. Gaye had little, if any, control over how much profit he could make.

*Id.* at *3 (emphasis added).

The facts in *Gaye* are very similar to the facts in the present case. The METROLift program is a service that is exclusively for Metro's approved customers.[14] To be eligible for the METROLift program, the passenger must have a recognized disability.[15]

Given that they are transporting disabled passengers, the drivers in the METROLift program are subject to strict hiring requirements and Metro makes the final hiring decision for all

---

[14] (Ex. "2" at pg. 63, lns. 1-5); (Ex. "3" at pg. 61, lns. 8-24); (Ex. "4" at pg. 78, lns. 21-23); (Ex. "5" at pg. 18, ln. 16 – 19, ln. 2).
[15] (Dkt. No. 35-1).

drivers in the program.[16]   Indeed, no person can work in the METROLift program as a driver without Metro's review and approval.[17]

If approved by Metro, the drivers are required to undergo a mandatory three weeks of training.[18]   Metro reviews and approves the training program for the drivers.[19] During that training, the drivers learn of Metro's customer service standards.[20]   The METROLift drivers are also provided similar training as Metro bus drivers (who are employees of Metro).[21]

After being approved for hire by Metro and completing the Metro required training, the drivers then drive scheduled routes for Metro. Metro monitors and supervises the day to day operations of the METROLift service and the activities of the drivers.[22] Indeed, Metro has a full staff of employees dedicated to operating the METROlift service.[23]

While performing their duties in the METROLift program, the drivers are subject to the full control of Metro.[24]   In fact, Metro controls every aspect of the drivers' day to day duties.[25] In addition to the dispatchers who regularly communicate with the drivers throughout the day, Metro has safety personnel in the field to ensure that the drivers are complying with Metro's policies and procedures.[26]

The METROLift drivers have scheduled shifts that they are required to work, like employees.[27]   Just like employees, the METROLift drivers are required to clock in and out at set

---

[16] (Ex. "1" at pgs. 61, ln. 24 to 62, ln. 9); (Ex. "5" at pgs. 28, ln. 17 to 29, ln. 4; pg. 31, lns. 13-17; pg. 22, lns. 12-18).
[17] (Ex. "3" at pgs. 15, ln. 14 to 16, ln. 6).
[18] (Ex. "2" at pg. 9, lns. 18-24).
[19] (Ex. "1" at pg. 63, lns. 21-23; pg. 64, ln. 9 to 65, ln. 4); (Ex. "5" at pg. 39, lns. 3-6).
[20] (Ex. "5" at pg. 39, lns. 15-18).
[21] (Ex. "1" at pg. 64, ln. 9 to 65, ln. 4).
[22] (Ex. "1" at pg. 90, lns. 10-22).
[23] (Ex. "1" at pg. 99, lns. 6-17; pg. 98, ln. 16 to 99, ln. 10).
[24] (Ex. "3" at pg. 27, ln. 1 to 29, ln. 5).
[25] (Ex. "2" at pg. 62, lns. 3-23); (Ex. "3" at pg. 29, ln. 18 to 31, ln. 22).
[26] (Ex. "1" at pg. 79, lns. 7-20); (Ex. "3" at pg. 31, lns. 2-22).
[27] (Ex. "2" at pg. 56, ln. 11 to 58, ln. 2); (Ex. "3" at pg. 50, lns. 7-8; pg. 51, ln. 1 to 52, ln. 22).

times.[28]   The drivers are also prohibited from charging a fare or fee to the passengers.[29] Instead,

their sole compensation is their hourly rate of pay.[30] Metro sets the hourly pay rates for the drivers

in the METROlift program.[31] Moreover, just like employees, Metro requires the drivers to wear a

uniform while working.[32]

The drivers are assigned their passengers by Metro and Metro instructs the drivers where

and when to drive.[33] Julia Saldana testified as follows:

> 13   Q.   Who creates the -- who assigns the passengers
> 14   to pick up to the driver?  Is that Metro, or is that
> 15   Yellow Cab?
> 16      A.   No, that's Metro.
> **17      Q.   Okay.  So Metro tells Yellow Cab "These are the**
> **18   routes that we're running," and Metro tells the drivers**
> **19   "These are the passengers you need to pick up and drop**
> **20   off"; correct?**
> **21      A.   Correct.**
> 22   Q.   Okay.  And if a driver is driving that route,
> 23   he's responsible for performing the passenger pickups
> 24   and drop-offs that are assigned; correct?
> 25      A.   Correct.

(Ex. "1" at pg. 87, lns. 13-25) (emphasis added).

Unlike true independent contractors who have the freedom to work when and where they

want, if any driver in the METROLift program decides, for instance, in the middle of his/her shift,

that he/she no longer wants to transport passengers for METROLift, the driver can be punished,

including being terminated.[34]

---

[28] (Ex. "2" at pg. 58, lns. 10-13); (Ex. "3" at pg. 63, lns. 17-25; pg. 64, ln. 16 to 65, ln. 4).

[29] (Ex. "4" at pg. 78, ln. 24 to 79, ln. 1); (Dkt. No. 35-17).

[30] (Ex. "5" at pg. 110, lns. 21-24).

[31] (Ex. "1" at pg. 1, lns. 7-16).

[32] (Ex. "1" at pg. 83, ln. 14 to 84, ln. 6); (Ex. "5" at pg. 77, lns. 1-11).

[33] (Ex. "1" at pg. 87, lns. 13-25); (Ex. "3" at pg. 63, lns. 1-16).

[34] (*See id.*)

Further, Metro supervises the drivers and has authority to fire any driver that fails to comply with Metro's policies and procedures.[35]  In fact, Metro has routinely fired drivers and placed them on probation.[36]  To ensure that the drivers comply with Metro's policies and procedures, Metro also issues fines to the drivers.[37]

Finally, the Class Members do not own the vehicles that they drive but are assigned the vehicles.[38]  Metro review and inspects these vehicles.[39]

In summary, like in *Gaye*, the Plaintiff and Class Members were employees under the FLSA.  They were given the vehicles to drive, told when and where to drive, and were assigned the passengers to transport.  They were paid an hourly rate for their work and were required to follow Metro's policies and procedures.  These facts are consistent with employee status.

Nevertheless, an analysis of each factor under the "economic reality" test demonstrates that the Plaintiff and Class Members are employees under the FLSA. *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998).  The following five non-exhaustive factors guide the analysis when applying the economic reality test: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.  *Id.*  No single factor is determinative.  *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043-44 (5th Cir. 1987).  The ultimate inquiry is whether the workers is in business for himself or is dependent upon the purported employer. *Id*.

---

[35] (Ex. "1" at pg. 73, lns. 16-19; 82, ln. 21 to 83, ln. 13).
[36] (Ex. "3" at pg. 35, ln. 6 to 37, ln. 19; pg 38, lns. 1-15).
[37] (Ex. "1" at pg. 75, ln. 1 to 78, ln. 25); (Ex. "3" at pg. 39, ln. 3 to 40, ln. 15).
[38] (Ex. "1" at pg. 101, ln. 14 to 102, ln. 2).
[39] (Ex. "5" at pg. 77, lns. 13-23).

### 1.   *Degree of Control*.

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Mr. W Fireworks*, 814 F.3d at 1049. "[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.* In determining the degree of control exercised by the putative employer over the worker, courts look to factors such as whether the employer had control over the following aspects: (1) where to work, (2) how long to work, (3) the number of days a project will last, (4) who secured the contracts for work, (5) the work assignments performed, and (6) the hiring and promotion of the workers. *See, e.g., Hopkins v. Cornerstone America*, 545 F.3d 343-44 (5th Cir. 2008); *Powell v. Collier Constr.*, 2005 WL 2429245, at *4-5 (W.D. La. 2005).

Similarly here, Plaintiff and the Class Members did not exert control over any meaningful part of their work such that they stood as separate economic entities. Metro controlled the Plaintiff's and Class Members' routes, told them when and where to drive, and which passengers to transport. Metro also required the Plaintiff and Class Members to report to work at set times and to follow specific policies and procedures. Further, Metro supervised the work of the Plaintiff and Class Members and punished them if they failed to follow Metro's policies and procedures. This factor weighs in favor of employee status.

### 2.   *Extent of the Relative Investments*.

The investments considered in determining employment status are capital expenditures, such as risk capital, equipment, and capital investments. *See Mr. W Fireworks, Inc.*, 814 F.2d at 1052. While every worker "invests" his know-how into the job he is tasked with, this cannot be regarded as an individual investment which would classify that individual as an independent

contractor rather than an employee. *Karna v. BP Corp. N. Am., Inc.*, CIV.A. H-12-0101, 2013 WL 1155485, at *9 (S.D. Tex. Mar. 19, 2013) *vacated on other grounds Karna v. BP Corp. N. Am., Inc.*, 11 F. Supp. 3d 809 (S.D. Tex. 2014).

Plaintiff and the Class Members primarily invested their time and energy and little else. On the other hand, Metro invested substantial sums towards offices, equipment, employees, and risk capital. This factor weighs in favor of employee status.

### 3. *Worker's Opportunity for Profit or Loss.*

Where the determinants of profit and loss are established by the putative employer, an employment relationship will likely be found. *See, e.g., Mr. W Fireworks, Inc.*, 814 F.2d at 1050-51. Here, Plaintiff and the Class Members were paid by the hour. Simply put, the only opportunity for "more profit" was to work more hours. Plaintiff and the Class Members could not increase their compensation through any business acumen or managerial skill. This factor weighs heavily in favor of employee status.

### 4. *Skill and Initiative Required in Performing Job.*

This factor looks to the degree of skill required for the job performed by the worker. *See Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 267 (5th Cir. 1987). Performance of work that requires little if any training may be regarded as evidence that a worker is an employee. *See McLaughlin v. Seafood, Inc.*, 687 F.2d 876 (5th Cir. 1989). The less skill involved, the more likely an employment relationship is found. *See, e.g., Halftery*, 821 F.2d at 267. Courts also look to whether the individual demonstrates some unique skill set or some ability to exercise significant initiative within the business. *See Hopkins*, 545 F.3d at 345.

The Plaintiff and Class Members were required to spend their days driving around Harris County transporting passengers. Driving is not a unique or special skill. Further, all of the major

components that evidence business initiative were controlled by Metro. Metro was contacted by the passengers, set the policies and procedures, inspected the vehicles, approved the training, decided the uniforms, and determined the routes to drive. As such, this factor weighs in favor of an employee status.

### 5. *Permanency of the Relationship.*

In determining whether this factor weighs in favor of employee status, courts look to the length of the relationship between the workers and the purported employer. *See Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 1995). Independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas an employee usually works for only one employer and such relationship is continuous and of an indefinite duration. *See Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989).

This factor heavily weighs in favor of employee status. Plaintiff and the Class Members worked for Defendants for extended periods of time, often for several years. For example, Plaintiff Sterling worked for Defendants for 11 years.[40] Plaintiff Connie Mason worked for Defendants for seven years.[41] This shows a continued relationship with Defendants such that Plaintiff and the Class Members are clearly employees.

### 6. *Economic Dependence.*

The economic reality of the relationship between Plaintiff/Class Members and Metro is a striking example of an employee/employer relationship. Plaintiff and the Class Members were not independent business owners, but drivers entirely dependent upon Metro for continued work. Under these facts, they are employees.

---

[40] Dkt. No. 35-2.
[41] Dk. No. 35-3.

**E.  Certification furthers the *Hoffman La-Roche* goal of judicial economy.**

In *Sperling v. Hoffman-La Roche*, 110 S. Ct. 482 (1989), the Supreme Court explained that collective actions permit "plaintiffs the advantage of lower individual costs to vindicate their rights by the pooling of resources.  The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity." *Id*. at 485.  A collective action is favored because it serves the legitimate goals of avoiding a multiplicity of duplicative lawsuits and expediting disposition of the action. *Id*.

As is the case here, the judicial system clearly benefits by the efficient resolution, in one proceeding, of common issues of law and fact arising from the same unlawful conduct. The misclassification of the METROLift drivers was uniform. Further, the number of Class Members in this case is believed to be in the hundreds.  It would burden the Court to resolve numerous cases addressing the same claims with the same facts and evidence.  Moreover, the compensation paid to the Class Members is also easily identified by the records.  Thus, a collective action is the ideal means to resolve the claims of the Class Members.

<u>**CONCLUSION**</u>

The Court should approve the Stipulation for Certification and authorize notice to the Class Members.

Respectfully submitted,

HODGES & FOTY, L.L.P.

By:   /s/ Don Foty_____
Don J. Foty
DFoty@hftrialfirm.com
Texas Bar No. 24050022
4409 Montrose Blvd, Suite 200
Houston, TX 77006
Telephone: (713) 523-0001

Facsimile: (713) 523-1116

ATTORNEY FOR PLAINTIFF AND
CLASS MEMBERS

## CERTIFICATE OF SERVICE

This is to certify that on May 7, 2021, 2021 a copy of the foregoing instrument was served upon all parties via the Court's ECF.

/s/ Don J. Foty
Don J. Foty